## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

**DANIEL SIPP,**

**Plaintiff,**

**v.**

**ALFONSO DAVID, JOHN COE,
STEPHEN RITZ, and ROB JEFFERYS,**

**Defendants.**

**Case No. 18-cv-2141-NJR**

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

This matter is before the Court on motions for summary judgment filed by Defendants Alfonso David, John Coe, Stephen Ritz (Docs. 116, 117), and Rob Jefferys (Docs. 120, 121). Plaintiff Daniel Sipp filed a consolidated response to both motions (Doc. 133, 134). Defendants David, Coe, and Ritz filed a reply brief (Doc. 135).

### BACKGROUND

On December 4, 2018, Plaintiff Daniel Sipp, through counsel, filed a Complaint alleging deliberate indifference in the treatment of his Achilles tendon injury while he was an inmate of the Illinois Department of Corrections ("IDOC") at Vienna Correctional Center ("Vienna") (Doc. 1). Sipp was no longer incarcerated at the time he filed his Complaint. On December 10, 2021, Sipp filed his Third Amended Complaint, alleging the following counts:

Count 1:   Eighth Amendment deliberate indifference claim against Alfonso David, Stephen Ritz, and John Coe for the failure to provide proper treatment for his injury.

Count 2:   Rehabilitation Act ("RA"), 29 U.S.C. § 794, *et seq.*, claim against Rob Jefferys (official capacity) for failing to provide Sipp with reasonable accommodations in light of his injury.

Count 3:     Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, claim against Rob Jeffreys (official capacity) for failing to provide Sipp with reasonable accommodations in light of his injury.

(Doc. 107).

### A. Initial Injury and Care

On December 8, 2016, Sipp reported to the medical staff that he injured his ankle while playing basketball (Doc. 117-6, p. 24). He was jumping and was pulled out of the air onto the ground, with all of his weight and two other players' weight, on his foot (*Id.*). Two inmates carried Sipp to the door, and a van took him to the medical unit (*Id.* at pp. 58-59). Sipp was first examined by Nurse Winters, who noted a deformity in his Achilles tendon (Doc. 117-1, p. 24). She noted a moderate amount of swelling, and Sipp was unable to put pressure on the foot or move his ankle from side to side (*Id.*). Sipp testified that Winters told him the tendon was torn (Doc. 117-6, p. 61). Winters referred Sipp to Dr. Alfonso David for further care (Doc. 117-1, p. 24). Winters called Dr. David because he was on call for Vienna and worked there one day a week. Vienna was without a medical director at the time (Doc. 117-2, pp. 8, 14). He made recommendations over the phone (*Id.*). Sipp was provided with an ace wrap, crutches, and ibuprofen. He was directed to apply ice, elevate the ankle, and not to bear weight on the ankle (Doc. 117-1, p. 24). He was also sent for an X-ray (*Id.*). The X-ray showed no fracture or dislocation (*Id.* at pp. 25, 250).

The following day, December 9, 2016, Dr. David saw Sipp in person (Docs. 117-2, p. 30; 117-1, p. 27). Generally, Dr. David's practice was to review the chart before seeing a new patient (Doc. 117-2, pp. 70, 74). Sipp indicated that the ankle was better, but he could not bear weight on it (Doc. 117-1, pp. 26-27). Dr. David testified that he did not write in his notes whether the nurse noted a deformity in the Achilles tendon (Doc. 117-2, p. 74). He examined

Sipp and noted slight edema, tenderness, but no bruising and no deformity (Docs. 117-1, p. 27; 117-2, pp. 75-76). Dr. David ordered to continue use of crutches with no weight bearing on the ankle (Doc. 117-2, pp. 76-77). He also ordered a low bunk, low gallery permit (*Id.*). Dr. David testified that he was not entirely clear of the exact injury; he had not ruled out a fracture—the X-ray results were pending (*Id.* at p. 79, 84, 90). He did not observe a deformity (*Id.* at pp. 76, 90-91, 93, 98-99). Dr. David testified that because he saw Sipp the day after his injury and there was some degree of swelling, the swelling may have prevented him from palpating the deformity (*Id.* at pp. 98-99, 100). Sipp testified that the first doctor—on December 8, 2016—told him he would need surgery and that he could see a disfigurement in his leg (Doc. 117-6, pp. 27-28).

Dr. David ordered Sipp to continue using crutches and refrain from bearing weight on the ankle (Doc. 117-1, p. 27). He also continued the order for ibuprofen and issued a low bunk, low gallery permit for one month (*Id.*). He indicated that medical staff would schedule a follow-up appointment for one week or whenever the X-ray results were received (*Id.*).

On December 13, 2016, the healthcare unit received the X-ray report, which showed no fracture or dislocation (Doc. 117-1, p. 250). Sipp next saw Dr. Coe in the healthcare unit on December 16, 2016 (*Id.* at p. 28). Dr. Coe noted swelling and a deep indentation at his Achilles tendon (*Id.* at pp. 28, 143; Doc. 117-3, pp. 13-14). Dr. Coe diagnosed Sipp with a torn Achilles tendon. He placed the ankle in a brace and provided Sipp with ibuprofen for pain (*Id.* at p. 28). He also submitted a request for the collegial review board—a board of doctors who review and approve medical requests—for an orthopedic evaluation (*Id.* at pp. 28, 143; Doc. 117-3, p. 14, 16). The request for collegial review was not marked urgent (Doc. 117-1, p. 143). Dr. Coe testified that his normal practice at the prison was to send inmates with torn

Achilles tendons to the orthopedic surgeon for evaluation, and the specialist could determine what additional tests, including an ultrasound, were needed (Doc. 117-3, p. 18).

Dr. Coe did not mark the request as urgent because the injury had occurred the week before and Sipp would need specialty care (*Id*. at p. 20). He would not have marked it urgent even if he had seen Sipp the day of the injury (*Id*.). There were three types of referrals for collegial review: emergency, urgent, and non-urgent (Doc. 117-4, p. 21). An emergency requires no referral and was for "true 911 emergencies" (*Id*.). Urgent requests for referrals were usually processed within the same business day but could be reviewed up to 36 or 48 hours after the request (*Id*.). According to Dr. Coe, marking it urgent also would have triggered a phone call to the collegial review board (Doc. 117-3, p. 19). A non-urgent request would be discussed at the regularly scheduled collegial review meeting, which generally took place weekly (Docs. 117-3, p. 19; 117-4, p. 21). Dr. Coe believed the request would be reviewed within a week, and the off-site visit would be arranged soon after (Doc. 117-3, pp. 19-20).

The referral request went to Dr. Stephen Ritz, the corporate medical director for Wexford Health Sources, Inc., who conducted utilization management (Doc. 117-4, pp. 13-14). Dr. Ritz testified that utilization management "looks at the determination of medical necessity and clinical appropriateness of the utilization of medical services." (*Id*. at p. 15). In reviewing Dr. Coe's request for an evaluation by an orthopedic surgeon, Dr. Ritz recommended an alternative treatment plan of obtaining an ultrasound of the Achilles tendon to determine definitively the nature of the injury (Docs. 117-1, p. 142, 144; 117-4, p. 48). The referral to a surgeon was deferred pending the results of the ultrasound (Doc. 117-4, p. 48). Dr. Ritz testified that generally the primary care physician would evaluate and determine if the Achilles tendon was injured, including through exams and advanced

imaging studies, before sending an individual to a specialist (*Id.* at pp. 75-76).

On December 23, 2016, Dr. David again saw Sipp for his injury (Doc. 117-1, p. 31). He noted the ankle was still tender; he also noted a depression in the tendon (*Id.*; Doc. 117-2, p. 98). He referred Sipp for an ultrasound of the tendon and submitted a collegial review request for the ultrasound (Doc. 117-1, p. 31). On January 17, 2017, Sipp received an ultrasound of his tendon (*Id.* at p. 34). The ultrasound showed that the tendon was completely torn and retracted (*Id.* at p. 140). On January 25, 2017, Dr. Coe had a follow-up visit with Sipp (*Id.* at p. 37). He noted Sipp had a complete tear of the tendon and submitted a request to the collegial review board for an orthopedic referral (*Id.*; Doc. 117-3, p. 33). He informed Sipp that he should use his crutches rigorously until the referral (Doc. 117-3, p. 33).

On February 13, 2017, Sipp met with Dr. Coe and complained about having to come to the healthcare unit every week to undergo inspection of his crutches (Doc. 117-1, p. 39). According to Sipp, the inspections were part of a safety measure to ensure an inmate was not making a weapon out of the crutches (Doc. 117-6, pp. 99-100). Sipp grew tired of walking from his unit on crutches to the healthcare unit for the inspections (*Id.*). He testified it was a mile walk, and he could not keep doing it (*Id.*). Sipp was informed of the increased risk of damage to his tendon without the crutches, but he insisted that he did not want to keep coming back for inspections (Doc. 117-1, p. 39). The crutches were discontinued per Sipp's signed refusal (*Id.*). On February 16, 2018, he complained to the nurse of 10 out of 10 pain in his tendon and requested the return of his crutches (*Id.* at p. 41). Dr. Coe saw Sipp that same day and reinstated Sipp's crutches (*Id.* at p. 42). He also noted that Sipp was approved for an orthopedic consult, but the appointment had not yet been scheduled (*Id.*). A note made in the medical record later that same day indicated that Sipp was scheduled for a consult for

February 20, 2017 (*Id.* at p. 43).

On February 20, 2017, Sipp first met with Dr. Mike Davis at Orthopedic Institute of Southern Illinois (Doc. 117-5, p. 5). Dr. Davis reviewed the ultrasound results and discussed treatment options (*Id.* at p. 6). He diagnosed Sipp with a left Achilles tendon rupture/tear. He explained the risks and benefits of surgery, and Sipp chose to proceed with a repair of the torn tendon (*Id.*). He was provided with a boot until surgery was approved (*Id.* at p. 4). The referral for surgery was submitted to the collegial review board on February 24, 2017, and approved on March 1, 2017 (Doc. 117-1, pp. 48, 151).

On March 16, 2017, Dr. Davis's office informed the healthcare unit that Dr. Davis wanted to discuss the case with another specialist before setting a surgery date (Doc. 117-1, p. 50). The nurse from Dr. Davis's office indicated she would call back the next week with more information. On March 28, 2017, Dr. Flowers, another physician at Vienna, contacted Dr. Davis's office for an update (*Id.* at p. 51). Dr. Flowers contacted Dr. Davis's office again on March 30, 2017, and was informed the specialists were still discussing the case (*Id.*). On March 31, 2017, Dr. Davis's office contacted Dr. Flowers. They indicated that Dr. Wood would be conducting the surgery and wanted to see Sipp for an evaluation before scheduling the surgery (*Id.* at p. 52). The appointment was scheduled for April 17, 2017 (*Id.*).

On April 17, 2017, Sipp met with Dr. Wood (Doc. 117-5, pp. 8-9). His examination indicated a rupture of the Achilles tendon with weakness in the plantarflexion (*Id.* at p. 9). He noted mild to moderate swelling (*Id.*). He ordered X-rays and ultimately diagnosed Sipp with a chronic Achilles tendon rupture (*Id.* at pp. 9-10). Dr. Wood recommended an Achilles tendon reconstruction (*Id.* at p. 10). Dr. Wood noted that reconstruction was recommended "[g]iven the chronicity of the element and its lack of improvement with time." (*Id.*).

Dr. Wood scheduled the ankle reconstruction for April 28, 2017 (Doc. 117-1, p. 60). Dr. Wood later rescheduled the surgery for May 12, 2017 (*Id*.). On May 12, 2017, Dr. Wood conducted the Achilles tendon reconstruction (Doc. 117-5, p. 1). On June 1, 2017, Sipp had a follow-up visit with Dr. Wood (*Id*. at p. 18). The incision looked good, and Sipp was directed to keep his leg elevated and be non-weight bearing (*Id*.). Sipp had another follow-up visit on June 12, 2017 (*Id*. at p. 19). He was directed to wear a boot with heel lifts and could proceed to 1/3 weight bearing after two weeks (*Id*.). He could then remove one heel lift and advance weight bearing weekly over a three-week period (*Id*.). Sipp's next follow-up appointment with Dr. Wood occurred on July 10, 2017 (*Id*. at pp. 20-22). At that point, Sipp was eight weeks post-surgery and was partial weightbearing with the assistance of a crutch (*Id*. at p. 20). He had no new complaints (*Id*.). Dr. Wood noted the wound was well healed, and Sipp demonstrated "good resisted plantarflexion strength" (*Id*. at p. 21). Dr. Wood noted a normal neurovascular exam; Sipp's skin was normal color, warm, and dry (*Id*. at p. 21). The records note that Sipp's condition was progressing well. He was directed to advance to full weightbearing in his boot without heel lifts. Sipp could also wean off the crutches and advance to regular athletic shoes after two weeks (*Id*.). Sipp was advised to avoid any jumping, running, or basketball for six months (*Id*.).

On August 24, 2017, Dr. David submitted a request for another orthopedic consultation due to Sipp's continued pain, swelling, and tenderness (Doc. 117-1, pp. 178-79, 186). The referral was approved, and Sipp saw Dr. Wood on October 12, 2017 (Doc. 117-5, p. 23). Sipp indicated that he had continued discomfort but it was less than previously noted (*Id*.). Dr. Wood noted that Sipp was ambulating without assistance and his wound was well healed with no evidence of infection (*Id*. at p. 24). Dr. Wood noted that he expected Sipp to

continue to improve over the next year and that he could advance to other activities as tolerated (*Id.*).

Sipp paroled from IDOC custody in January 2018 (Doc. 117-6, p. 140). He testified that his ankle is still tight, he still experiences pain, he is physically not able to run or participate in activities like he used to before his injury, and that his muscle does not have the same strength (*Id.* at pp. 16-17, 22). He does not use any assistive devices but does occasionally use an ACE wrap (*Id.* at p. 20). He has not seen a doctor since being paroled (*Id.* at pp. 19-20).

**B. Expert Testimony**

*1. Dr. Cannestra*

Both Sipp and the medical defendants offered expert testimony. Sipp's expert, Dr. Vincent Cannestra, is an orthopedic surgeon with Fox Valley Orthopedic Associates (Doc. 117-7, p. 9). Dr. Cannestra testified in his practice he performed one to two Achilles tendon repairs a year (*Id.* at pp. 8-9). As to Sipp's injury, Dr. Cannestra testified that he believed Sipp had a full tear of his Achilles tendon on December 8, 2016, given the manner in which he injured his ankle and the physical exam findings (*Id.* at p. 5).

Dr. Cannestra could not say whether the gap in Sipp's tendon worsened between the time of the injury and the date of the ultrasound (*Id.* at pp. 18-19). When Sipp injured his ankle on December 8, 2016, Dr. Cannestra acknowledged that the nature of Sipp's injury had not yet been identified (*Id.* at pp. 20-21). He testified that, in his opinion, Dr. David's orders when he received the call from the nurse about Sipp's injuries were appropriate. This included the orders to wrap the ankle, ice and elevate it, and use a crutch in order to be non-weightbearing (*Id.* at pp. 19-21). He further acknowledged that swelling could mask issues with the Achilles tendon (*Id.* at p. 23). He testified that Dr. David made no comment in his

record about the integrity of the Achilles tendon, the range of motion or weakness of the ankle, or any indention in the tendon (*Id*. at pp. 27-28). He further testified that when Dr. Coe saw Sipp on December 16, 2016, he diagnosed Sipp with a tendon injury, placed a brace to immobilize the ankle, and submitted a request for a referral to an orthopedic surgeon, which Dr. Cannestra testified was appropriate (*Id*. at pp. 37-38).

As to the request for ultrasound, Dr. Cannestra acknowledged that it is one of the tools for identifying an Achilles tendon injury, although not the best tool (*Id*. at pp. 38-39). He acknowledged that both magnetic resonance imaging ("MRI") [1] and ultrasound are appropriate diagnostic tools (*Id*. at p. 39). He also referred to an MRI as the gold standard in diagnosing Achilles tendon injuries (*Id*. at pp. 39-40). He agreed that an ultrasound could also be used (*Id*. at p. 41).

Dr. Cannestra believed that Sipp's injury was an urgent condition which needed an ultrasound immediately (*Id*. p. 69). It took six weeks after the injury to obtain an ultrasound (*Id*.). He testified that he believed Sipp should have seen an orthopedic surgeon within three weeks of his injury (*Id*. at p. 85). Dr. Cannestra testified that the longer surgery is delayed, a repair becomes less possible, and a reconstruction of the tendon is needed (*Id*. at pp. 88-89, 92). According to Dr. Cannestra, surgery should be pursued as soon as possible, with three weeks being the optimal time for surgery (*Id*. at p. 85, 88). He testified that approximately three months after an injury, a patient is no longer a candidate for repair (*Id*. at pp. 55-56). He believed that Dr. Coe should have marked "urgent" on the referral form in order for Sipp to receive a timely imaging study (*Id*. at p. 87).

---

[1] MRIs capture soft tissue images, while X-rays provide a good view of bones but not soft tissue or inflammation well.

2. *Dr. Doser*

The medical defendants' expert, Dr. Brandon Doser, is a licensed physician who has completed a residency and orthopedic fellowship in treatment of the foot and ankle (Doc. 117-8, p. 51). At the time of his deposition testimony, he was not yet board-certified but was expecting his certification (*Id*.). He has performed numerous Achilles tendon surgeries—approximately one rupture repair a week (*Id*. at p. 7). He testified approximately 25% of ruptures require reconstruction, including additional Achilles lengthening and tendon transfers (*Id*. at p. 8). Dr. Doser testified that on a 1.7 centimeter gap, the gap in the rupture Sipp experienced, a repair rather than a reconstruction can be completed most of the time during the acute phase, or within six weeks of the injury (*Id*. at p. 10). It is Dr. Doser's personal goal in his practice to conduct surgery within six weeks of the injury (*Id*. at pp. 34-35). Even if seen within six weeks, if the tendons are too damaged and frayed, then it would require a reconstruction (*Id*. at p. 10). It depends on the degeneration of the tendon (*Id*. at pp. 42-43). Sometimes an end-to-end repair can be done after six weeks, when the injury goes from acute to chronic (*Id*.). Dr. Doser testified that the delay caused by the orthopedic group's scheduling of the surgery made an end-to-end repair much less likely to occur (*Id*. at pp. 52-53).

Dr. Doser was not able to determine the state of Sipp's injury based on the materials provided (*Id*. at pp. 11-12). He testified it was always a judgment call as to whether a rupture required a repair or reconstruction no matter when the injury occurred, and he could not determine whether Sipp would have only needed a repair if he had been seen by a specialist earlier (*Id*. at p. 44). When a patient is presented with a suspected Achilles rupture, Dr. Doser testified that he would immobilize the ankle, direct the individual to be non-weightbearing, and order additional imaging—almost always an MRI (*Id*. at p. 21). According to Dr. Doser,

an MRI is the gold standard for determining injuries, but Dr. Doser also testified that an ultrasound was an acceptable form of determining injuries (*Id*. at pp. 19-20).

As to the initial injury, Dr. Doser testified that there would be an indentation in the calf or ankle in the weeks following the injury (*Id*. at p. 26). He testified, however, that it would not be immediately palpable due to swelling (*Id*.). Although it could be possible for there to be an indentation, whether one could feel the injury would depend on the amount of swelling (*Id*.). Feeling an indentation in the calf would normally be a good sign of a ruptured tendon (*Id*. at p. 27). Although Dr. Doser noted that the nurse indicated an indentation in Sipp's leg the first day, as a treating physician he would want to see it and feel it himself before determining whether there was actually an issue with the tendon (*Id*. at pp. 27-28). Dr. Doser testified that when he sees a patient with an ankle injury, he first obtains an X-ray. If the X-ray is fine, he begins looking for a soft tissue injury (*Id*. at p. 30). If the injury appears severe, showing signs of extreme pain, edema, and bruising, then he would usually obtain an MRI (*Id*.). As to the decision to obtain an ultrasound of Sipp's tendon, Dr. Doser testified that when dealing with an Achilles injury, the more imaging and information regarding the area is better for treatment (*Id*. at pp. 32-33).

### C. ADA and RA Accommodations

When Dr. David first examined Sipp, he put him on a non-weightbearing restriction and gave him a medical order for a low bunk, low gallery permit (Doc. 117-1, p. 27). Tammy Stevens, the healthcare unit administrator at Vienna, testified that when a doctor issues the low bunk, low gallery permit, the nurse would take the order and hand it to the assignment office (Doc. 133-1, p. 19). Ryan McClellan, a correctional and assignment officer at Vienna, also testified that the medical providers would provide the permits, but officers also had the

ability to call the medical records office because a copy was also kept in an individual's medical file (Doc. 133-2, pp. 14-16). Once the permit was received, the assignment officer would obtain the proper placement for the individual (*Id*. at p. 14).

Despite having a permit, Sipp testified that he was told by correctional officers that they lacked proof of his permits (Doc. 133-4, p. 2). He was told to wait and informed the issue would eventually be resolved (Doc. 117-6, p. 183). It never was resolved (*Id*. at pp. 183-84). Thus, he was housed in an upper gallery until he suffered a fall in April 2017 (*Id*. pp. 146-48).

Climbing to the upper galleries was extremely painful and exhausted Sipp's arms due to having to use the crutches (Doc. 133-4, p. 2). He also had to make weekly visits to the healthcare unit for inspections of his crutches—and later his boot (*Id*. at pp. 2-3). The walk took him approximately 45 minutes with his crutches, and he often made the walk in the dark and in cold weather (*Id*.). He testified that the walks were painful and exhausting. Further, even with the walking boot, short distances were difficult, and he would have to stop often (Doc. 117-6, p. 71). Although he complained to correctional officers that he should not be required to make the long trek to the healthcare unit for inspections, he testified that he received no other assistance for the checks (Doc. 133-4, p. 3). He also asked correctional officers to hold the inspections in his own housing unit but was told the request was not possible (*Id*.).

Michelle Morgan, an administrative assistant to the chief administrative officer at Vienna in charge of policies and internal audits, testified that she was not familiar with the policy regarding low bunk, low gallery assignments but did work with inmates with disabilities (Doc. 133-5, pp. 7-8, 10-11). When she received a request for an accommodation, she met with the individual to discuss the disability and the accommodation needed (*Id*. at

p. 11). She testified that the prison did not make accommodations for temporary disabilities unless the offender requested an accommodation (*Id*. at p. 12). She was not aware of a medical provider requesting an ADA accommodation for an offender, nor did she recall an inmate ever asking for an accommodation because he used crutches (*Id*. at pp. 12, 14). She was not aware of any policies regarding security checks of medical equipment (*Id*. at p. 22).

Legal Standards

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014), citing Fed. R. Civ. P. 56(a). *Accord Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enter., Inc.*, 753 F.3d 676, 681-82 (7th Cir. 2014).

In assessing a summary judgment motion, a district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542 (7th Cir. 2014).

### B. Deliberate Indifference

Prison officials violate the Eighth Amendment's proscription against "cruel and unusual punishments" if they display deliberate indifference to an inmate's serious medical needs. *Greeno v. Daley*, 414 F.3d 645, 652–53 (7th Cir. 2005) (*quoting Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks omitted)). *Accord Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) ("[D]eliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution."). A prisoner is entitled to reasonable measures to meet a substantial risk of serious harm — not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

To prevail, a prisoner who brings an Eighth Amendment challenge of constitutionally deficient medical care must satisfy a two-part test. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (*citing Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006)). The first prong that must be satisfied is whether the prisoner has shown he has an objectively serious medical need. *Arnett*, 658 F.3d at 750. *Accord Greeno*, 414 F.3d at 653. A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). *Accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (violating the Eighth Amendment requires "deliberate indifference to a substantial risk of serious harm.") (internal quotation marks omitted) (emphasis added).

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *Greeno*, 414 F.3d at 653. A plaintiff need not show the individual literally ignored his complaint, just that the individual was aware of the serious medical condition and either

knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008).

A<span style="font-variant:small-caps">NALYSIS</span>

### A. Deliberate Indifference

The medical defendants do not dispute that Sipp suffered from a serious medical condition. Instead, they argue, when viewing the facts in the light most favorable to Sipp, there is no evidence to suggest that Defendants acted with deliberate indifference. *See Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021) (The court's "assigned task is to take the facts in the light most favorable to the non-moving party.").

#### 1. Dr. David

Simply put, there is no evidence to suggest that Dr. David acted with deliberate indifference in diagnosing Sipp's injury. Sipp first presented to the healthcare unit on December 8, 2016. The nurse noted an injury from playing basketball and documented a deformity in the Achilles tendon (Doc. 117-1, p. 24). Dr. David was not at the facility but relayed orders to the nurse over the phone. He ordered that Sipp's ankle be wrapped, iced and elevated, that Sipp be provided pain medication and crutches to be non-weightbearing, and kept him in the infirmary so that he could be monitored. Dr. Cannestra testified these initial actions by Dr. David, who had not yet seen Sipp's injury, were appropriate (Doc. 117-7, pp. 19-21).

Dr. David did not examine Sipp in-person until the next day, December 9, 2016. Dr. David noted no deformity in Sipp's ankle (Doc. 117-1, p. 27). Dr. Cannestra testified that had Dr. David done an adequate exam, the Achilles tendon rupture should have been obvious to any physician (Doc. 117-7, p. 94). He believed that a proper examination was not completed because Dr. David did not document the integrity of the tendon, range of motion

of the ankle, any weakness of the ankle, and any indentations in the tendon (Doc. 117-7, p. 27). Dr. David only documented that there was no deformity in the tendon.

But Dr. Cannestra acknowledged that swelling at the site could mask issues with the Achilles tendon, and that a doctor could disagree with a nurse's initial diagnosis (*Id*. at pp. 22-23). Defendants' expert, Dr. Doser, also acknowledged that swelling could make palpitating the injury to the tendon difficult (Doc. 117-8, p. 26). Dr. Doser further noted that although the nurse indicated an indentation in Sipp's leg the first day, as a treating physician, he would want to see it and feel it himself before determining whether there was an actual injury to the tendon (*Id*. at pp. 27-28).

Although the nurse had noted a deformity at the Achilles tendon (Doc. 117-1, p. 24), Dr. David noted that he found no deformity during his examination (*Id*. at p. 27). Sipp did testify that the first doctor he saw on December 8, 2016, noted a disfigurement and stated he would need surgery (Doc. 117-6, pp. 27-28), but Sipp did not see Dr. David until December 9, 2016. Dr. David testified he saw no deformity and that there was a degree of swelling that might have prevented him from feeling the tendon (Doc. 117-2, pp. 98-99). He was not quite sure of the exact nature of the injury and wanted to rule out a fracture, but the X-ray results were not ready for review (*Id*. at pp. 79, 84, 90). He directed Sipp to continue to refrain from bearing weight on the ankle until Dr. David received the X-ray report (Doc. 117-1, p. 27).

At most, Dr. David's failure to diagnose the injury to the Achilles tendon amounted to negligence. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Although Dr. Cannestra described Dr. David's examination as "mediocre," Dr. David did examine Sipp and sought additional testing (Doc. 117-7, pp. 35-36). There is no evidence to suggest that Dr. David inexplicably delayed care for Sipp as he was waiting for the X-ray to rule out a fracture. Even

when taking the facts in the light most favorable to Sipp and assuming that Dr. David told Sipp he would need surgery, there is no evidence to suggest that his decision to await the X-ray results was a substantial departure from professional judgment or practice. When "the evidence shows that a decision was based on medical judgment, a jury may not find deliberate indifference, even if other professionals would have handled the situation differently." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021); *Petties*, 836 F.3d at 729 ("[E]vidence that *some* medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim."). Although Dr. Cannestra testified that he believed Dr. David could have diagnosed the injury, he acknowledged that swelling of the ankle might prevent a treating physician from immediately identifying a tendon injury. He further acknowledged that an X-ray was an appropriate tool to rule out a fracture (Doc. 117-7, p. 34). Dr. Doser also testified that when he first sees a patient with a suspected injury, the patient is X-rayed to rule out a fracture (Doc. 117-8, p. 30). There is simply no evidence from which a jury could find that Dr. David's decision to wait for the X-ray results, while continuing with the care and instructions already ordered the day before, amounted to deliberate indifference. Given the expert testimony, the decision was not "so far afield of accepted professional standards" to suggest it was not based on medical judgment. *Dean*, 18 F.4th at 241 (quoting *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006)). Thus, Dr. David is entitled to summary judgment.

### 2. *Dr. Coe*

Turning to Dr. Coe, Sipp acknowledges that Dr. Coe properly identified his injury as a torn Achilles tendon. (Docs. 117-1, p. 28; 134, p. 23). Further, Dr. Coe submitted the request for an orthopedic consult for collegial review (*Id*. at pp. 28, 143). Dr. Cannestra testified that

Dr. Coe acted appropriately in diagnosing Sipp, placing a brace, and referring the patient for an orthopedic appointment (Doc. 117-7, pp. 37-38). Instead, Sipp takes issue with the fact that Dr. Coe failed to mark the collegial review request as "urgent" (Doc. 117-1, p. 143). He further maintains that Dr. Coe did not have to submit the case to the collegial review board, nor did he have to submit Sipp for an ultrasound after receiving Dr. Ritz's response from the collegial review board.

Sipp makes much of the failure of Dr. Coe to mark "urgent" on the request for an orthopedic referral. But the difference between "urgent" collegial requests and normal referrals were a few days. Dr. Ritz testified that "urgent" requests were reviewed within 36 to 48 hours, and non-urgent requests were reviewed on a weekly basis (Doc. 117-4, p. 21). The referral in this case was processed within six days (Doc. 117-1, p. 144). Further, at the time Dr. Coe made the referral, Sipp was well within the three weeks that Dr. Cannestra indicated was the optimal time for treatment and the three-month period Dr. Cannestra indicated was the acceptable time for treating an Achilles tendon. It was also well within the six-week time frame identified by Dr. Doser as his personal goal for repairing Achilles tendons (Doc. 117-8, pp. 34-35).

Further, there is no evidence that Dr. Coe was involved in submitting the request for an ultrasound to the collegial review board or in scheduling the ultrasound (Doc. 117-1, p. 31). Nor is there any evidence to suggest that he participated in the decision to obtain an ultrasound rather than send Sipp directly to an orthopedic surgeon. The records indicate that Dr. Ritz reviewed Dr. Coe's request for an orthopedic referral and ordered additional information in the form of an ultrasound. Further, it was Dr. David, not Dr. Coe, who examined Sipp after Dr. Ritz's request, and referred him for an ultrasound on December 23,

2016 (Doc. 117-1, pp. 31, 145). There is no evidence to suggest that Dr. Coe participated in Sipp's care again before Sipp had the ultrasound on January 17, 2017. He submitted the request for a referral well within the optimal time frame identified by both expert witnesses. Even though he did not mark the referral as urgent, the request was reviewed well within the acceptable time frames. Thus, Dr. Coe is also entitled to summary judgment.

### 3. *Dr. Ritz*

As to the claim against Dr. Ritz, Sipp alleges that Dr. Ritz acted with deliberate indifference when he denied Dr. Coe's request for Sipp to be seen by an orthopedist and, instead, submitted him for an ultrasound. Dr. Ritz testified he sought an ultrasound to determine the definitive nature of the injury (Doc. 117-4, p. 48). Both experts testified that an ultrasound was an appropriate method for diagnosing an Achilles injury. But Sipp had already been diagnosed with an indentation to the Achilles tendon (Docs. 117-1, p. 28; 117-3, pp. 14-15). Dr. Coe testified that his impression was a torn Achilles tendon, and he put information in the request for collegial review to indicate those findings (Doc. 117-3, p. 14). Dr. Coe further did not see the need for any kind of imaging due to the position of the tendon (*Id.* at pp. 14-15). Dr. Coe testified his experience in the prison system was that individuals with torn Achilles tendons were sent to an orthopedic surgeon who could then decide if further imaging was needed prior to surgery (*Id.* at p. 18). Dr. Cannestra testified that he had performed tendon repairs without any imaging (Doc. 117-7, p. 48). Although Dr. Doser testified that additional imaging was helpful (Doc. 117-8, pp. 32-33), there remains an issue of fact as to whether the decision to seek additional imaging rather than refer Sipp directly to the specialist was based on medical judgment. In fact, Dr. Coe testified that the decision to seek additional imaging was not even his normal experience in the prison system.

The decision to seek an ultrasound rather than send Sipp directly to the surgeon resulted in a delay in treatment. Sipp did not receive an ultrasound until January 17, 2017, and he did not see the surgeon until February 20, 2017. "In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm. That is, a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental." *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013) (internal citations omitted); *Dean*, 18 F.4th at 242 (a plaintiff must show "the delay exacerbated the injury or unnecessarily prolonged pain.").

There remains a dispute of fact as to whether the delay in this case caused harm to Sipp. Dr. Cannestra testified that the delay resulted in Sipp having a reconstruction instead of a repair of his tendon. He testified that a patient would no longer be a candidate for repair three months after the injury, and the optimal time for a repair was three weeks after the injury (Doc. 117-7, p. 54, 55-56). He could not say whether the gap in the tendon worsened between the time of the injury and the ultrasound (*Id*. at pp. 18-19). Dr. Doser testified that he was unable to determine the extent of Sipp's injury with the materials provided (Doc. 117-8, p. 11-12).

But the medical records from Dr. Wood indicate that he recommended a reconstruction, rather than repair, of Sipp's tendon due to "the chronicity of the element and its lack of improvement with time." (Doc. 117-5, p. 10). He also noted that the injury "occurred quite some time ago." (*Id*. at p. 8). Further, there is evidence in the record indicating Sipp was in pain during the time before surgery, and he testified to having pain and difficulties walking, even at the time of his deposition (Doc. 117-6, p. 23).

There remains a dispute as to whether the need for a reconstruction was caused by the delay in Sipp seeing a surgeon or the delay after he saw the surgeon. He saw Dr. Davis on February 20, 2017, but did not have surgery until almost three months later, on May 12, 2017 (Doc. 117-5, p. 2). But there is evidence to suggest a delay in seeing the surgeon due to Dr. Ritz's requirement that Sipp obtain an ultrasound prior to being referred out for care. Thus, the Court finds that Dr. Ritz is not entitled to summary judgment at this time.

### B. ADA and RA Claims

Defendant Rob Jeffreys argues that he is entitled to summary judgment on Sipp's ADA and RA claims. Jeffreys argues that Sipp did not have a qualifying disability and, even if he did, he was provided reasonable accommodations.

In order to make out a *prima facie* case of discrimination under both the ADA and the RA, a plaintiff must show: (1) that he suffers from a disability as defined in the statutes, (2) that he is qualified to participate in the program in question, and (3) that he was either excluded from participating in or denied the benefit of that program based on his disability. *Jackson v. City of Chicago*, 414 F.3d 806, 810 (7th Cir. 2005). The RA further requires that a plaintiff show that the program in which he was involved received federal financial assistance. *Id.* at 810 n.2; *see also* 29 U.S.C. § 794(a). *Novak v. Bd. of Trustees of S. Ill. Univ.*, 777 F.3d 966, 974 (7th Cir. 2015). But the relief under both of the provisions is co-extensive, and the analysis is the same. *Jaros v. Illinois Dep't of Corrs.*, 684 F.3d 667, 671 (7th Cir. 2012); *King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 988 (7th Cir. 2020) (claims under the Rehabilitation Act are "functionally identical" to ADA and the two are considered together.).

Jeffreys first argues that Sipp did not qualify as a disabled individual for his Achilles tendon injury. The ADA defines a disability as "a physical or mental impairment that

substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1); *see also* 29 U.S.C. § 705(9)(b) (RA's definition of disability refers to the ADA). Major life activities under the statute "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. §12102(2)(A).

Here, Sipp offers facts from which a jury could find that he qualified as a disabled individual. An individual can be considered a disabled individual due to difficulties with walking. *See Jaros*, 684 F.3d at 672 (plaintiff demonstrated he was a qualified individual due to his difficulties walking). But "[t]o qualify as disabling, a limitation on the ability to walk must be permanent or long term, and considerable compared to the walking most people do in their daily lives." *Fredrickson v. United Parcel Service, Co.*, 581 F.3d 516, 522 (7th Cir. 2009). The record reflects that Sipp could not use his ankle to walk directly after his injury. He was instructed not to place weight on his ankle and was given crutches to help him walk. *See Fredrickson*, 581 F.3d at 522 (citing *EEOC v. Sears, Roebuck, & Co.*, 417 F.3d 789, 793-94, 802 (7th Cir. 2005) (plaintiff's neuropathy substantially limited her ability to walk where she could not walk one city block without losing sensation in her legs, she walked with a cane and had to balance against a wall, and she was under doctor's orders to avoid excessive walking)). Sipp experienced difficulties walking long distances to the chow hall and to the healthcare unit. Even walking with crutches, he had to stop and take breaks (Doc. 117-6, pp. 104-105). He also experienced difficulties walking the approximately one mile distance to the medical unit for inspections, so much so that he gave up his crutches for a short time because he could not keep making the trek with crutches (*Id.* at p. 99). He also testified that even walking short

distances, he had to stop and "take breathers" (*Id.* at p. 71). There is also some evidence from which a jury could find that his limitations on walking were long term. Although he was able to ambulate without assistive devices by October 2017, Sipp testified that he still experienced difficulties walking (*Id.* at pp. 139-140, 23). He specifically testified that, at the time of his deposition, he could not walk with regular movement in his stride (*Id.* at p. 23). He testified that standing for a while hurt his back and caused him "a lot of pain." (*Id.* at p. 22).

Jeffreys cites to *Homan v. Triplett*, Case No. 17-cv-4710, 2020 WL 5570039, at * 8-9 (N.D. Ill. Sept. 17, 2020), to support his argument that Sipp was not a disabled individual. In that case, the district court found the plaintiff was not a qualified individual because he testified that he could walk up and down stairs *on his ankle* and climb up into his bunk after an Achilles injury. But the evidence in this case demonstrates that Sipp could not use his ankle and experienced difficulties in performing tasks such as walking up the stairs and long distances. When he gave up his crutches for a short time, he had to hop back to the unit, stopping to rest between hops (Doc. 117-6, p. 104). He did not put weight on his ankle during the period without his crutches (*Id.*). He also experienced difficulties walking up the stairs to his gallery and fell on April 11, 2017, injuring his back (*Id.* at pp. 146-147, 189). Thus, Sipp has offered evidence from which a jury could find that his injury significantly impacted his ability to perform everyday tasks.

Sipp also has offered evidence that he was denied access to services or programs because of his disability. Access to meals, certain housing facilities such as showers and toilets, and access to medical services are among the programs and activities protected by the Acts. *See Rodesky v. Wexford Health Sources, Inc.*, 582 F. Supp.3d 594, 601 (C.D. Ill. Aug. 19, 2020). If participating in a service or activity, such as seeking medical attention, comes with

a risk of injury, then an inmate could be denied the benefits of those services under the Acts. *Id*. at 602. *See also Miller v. Wisconsin Dep't of Corrs*., Case No. 08-cv-62-bbc, 2008 WL 2563154, at * 5 (W.D. Wis. April 22, 2008) (individual could be denied services when forced to walk long distances in severe pain to seek out prescribed medication without the use of a cane). Sipp testified in his affidavit that walking to the upper galleries was extremely painful and exhausted his arms because he was required to use crutches (Doc. 133-4, p. 2). He fell on one occasion. He also had to walk, unassisted, to the healthcare unit for equipment inspections, often in the cold and dark, on a weekly basis (*Id*. at pp. 2-3). Sipp sought the accommodations of a low bunk, low gallery permit and requested to have the safety inspections conducted in his own housing area. Although Sipp was told that the inspections were for safety and security, Jeffreys fails to offer any evidence that the inspections had to be conducted in the healthcare unit. Nor has he offered any evidence that the request for a lower gallery and lower bunk was unreasonable.

Finally, Jeffreys argues that Sipp is not entitled to compensatory damages because he failed to show intentional discrimination. In order to recover compensatory damages, an individual must show intentional discrimination. *Lacy v. Cook Cnty., Ill.,* 897 F.3d 847, 862 (7th Cir. 2018). *See also Strominger v. Brock*, 592 F. App'x 508, 511 (7th Cir. 2014). In *Lacy*, the Seventh Circuit joined with the majority of courts in finding that intentional discrimination in a damages action can be established by showing deliberate indifference. *Lacy*, 897 F.3d at 863. The Seventh Circuit requires a two-part test: a plaintiff must show "both (1) 'knowledge that a harm to a federally protected right is substantially likely,' and (2) 'a failure to act upon that likelihood.'" *Lacy*, 897 F.3d at 863 (quoting *S.H. ex rel. Durrell v. Lower Merion School Dist*., 729 F.3d 248, 263 (3rd Cir. 2013)).

Here, there is evidence in the record of deliberate indifference. Sipp was issued a low gallery, low bunk permit (Doc. 117-1, p. 27). Sipp testified that he informed correctional officers and wrote grievances about his low bunk and low gallery permit (Doc. 117-6, pp. 145-147, 182-184). But despite assignment officer McClellan's testimony that IDOC personnel could call to check on the permits, there is no evidence that anyone at the prison picked up a phone to inquire about the status of Sipp's permit (Doc. 133-2, pp. 15-16). Instead, they kept telling him to wait, and the issue would be sorted out by staff (Doc. 117-6, pp. 183-84, 197). When he tried to ask medical staff, they indicated that correctional officers were in charge of bedding charts (*Id*. at p. 197). Sipp testified that he kept waiting for the issue to be sorted out, but it never was, and he ended up falling down the stairs as a result of correctional officers not acknowledging his permit (*Id*. at pp. 197-98). Thus, there is evidence from which a jury could find that staff acted with deliberate indifference as to the request for a low bunk, low gallery permit.

As to the safety checks in the healthcare unit, Sipp testified that he complained to correctional officers that he should not be required to travel to the healthcare unit for the checks. He asked that the checks be conducted in his housing unit but was told that was not possible (Doc. 133-4, p. 3). But there has been no evidence from Jeffreys to indicate a safety or security reason for having the checks in the healthcare unit, nor has he shown why it was impossible to have the checks in the housing unit. Healthcare unit administrator Tammy Stevens was not aware of the security checks on medical equipment (Doc. 133-1, p. 18), nor was McClellan aware of the process of security checks for equipment (Doc. 133-2, p. 11). Thus, there remains an issue of fact as to whether staff at Vienna acted with deliberate indifference in failing to obtain reasonable accommodations for Sipp. Thus, Jeffreys's motion for summary

judgment is **DENIED**.

## CONCLUSION

For the reasons stated above, the summary judgment motion by John Coe, Alfonso David, and Stephen Ritz is **GRANTED in part and DENIED in part**. Summary judgment is **GRANTED** as to Dr. Coe and Dr. David but **DENIED** as to Dr. Ritz. Rob Jeffreys's summary judgment is also **DENIED**.

To the extent the remaining parties believe that a settlement conference would be beneficial on the remaining claims, Defendants and Sipp are **DIRECTED** to file a notice with the Court by **April 17, 2023**, indicating their amenability to participating in a settlement conference. The Court will then either refer the matter for mediation or set a telephone conference for the purpose of setting a firm trial date.

**IT IS SO ORDERED.**

DATED:   March 20, 2023

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**